IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TERRANCE PRUDE, *et al.*,

Plaintiffs,

v.

SHAWN GALLINGER, BRANDON WARD, MARY TAYLOR, and GARY BOUGHTON,

Defendants.

OPINION AND ORDER

18-cv-79-slc

---

Six pro se plaintiffs are proceeding in this action against Wisconsin Secure Program Facility (WSPF) employees Shawn Gallinger, Brandon Ward, and Mary Taylor, on Eighth Amendment claims challenging how Gallinger carried out a series of strip searches on December 14, 2018, and challenging Ward and Taylor's failure to stop Gallinger's abuse. Before the court is plaintiffs' motion for summary judgment. (Dkt. 41.) Since there are factual disputes material to whether defendants violated plaintiffs' rights, I am denying the motion and this case will proceed to trial.

## UNDISPUTED FACTS

I start by noting that defendants object generally to many of plaintiffs' proposed findings of fact – related to alleged Prison Rape Elimination Act complaints, the alleged destruction of evidence, the admissibility of certain evidence – as irrelevant to plaintiffs' claims in this lawsuit. Defendants' objection is well-taken: I granted plaintiffs leave to proceed on claims related to how defendants Gallinger, Ward, and Taylor acted *during* the December 14, 2018, strip search. Additionally, I have denied plaintiff Prude's motion for sanctions related to his claim that defendants destroyed video footage of the strip search.

(Dkt. 106.) I will neither broaden the scope of this lawsuit nor revisit my decision on Prude's sanctions motion. Accordingly, I am limiting the following recitation of facts to the parties' proposed findings of fact, responses, and underlying evidence related to that incident and omit irrelevant and argumentative proposed findings.

**A. Parties**

The six plaintiffs in this lawsuit were all incarcerated at WSPF as of December 14, 2017. They are Terrance Prude, Andreas Del Real, Troy Johnson, Daniel J. Mitchell, Miguel Garcia, and Jermone Walker. Defendants Shawn Gallinger, Brandon Ward, and Mary Taylor were WSPF correctional officers at that time.[1]

**B. DOC Search Procedures**

Institution-wide cell and strip searches are governed by Wis. Admin. Code DOC §§ 306.15, 306.16, 306.17(2). During an institution-wide search, every area of the institution is searched for contraband, including each inmate's cell. Inmates are strip-searched to ensure that they are not concealing contraband. § 306.17(2)(b) provides that strip searches should take place in private.

Before an institution-wide search commences, a security supervisor circulates a list of job assignments during the search, and security staff members are assigned to strike teams, consisting of 4-5 staff members and a team leader. Two strike teams are assigned to each range.

---

[1] WSPF Warden Gary Boughton is a defendant in his official capacity because plaintiffs seek injunctive relief. Boughton was not involved in the events material to plaintiffs' claims.

When strip searches are conducted, at least two staff members must be present. One staff member conducts the search, while the second staff member stands off to the side and observes to ensure that proper procedures are followed. Strip searches are conducted inside an inmate's cell so that only the two staff members conducting the strip search can see the inmate. No other staff members or inmates should be able to see inside the cell during a strip search. Female staff members may be present on the unit during strip searches, but female staff members do not conduct strip searches and they are not to have a direct view of an inmate being strip searched.

### C. December 14, 2017, Strip Searches

On December 14, 2017, Warden Gary Boughton authorized an institution-wide cell search and strip searches of all prisoners in WSPF's Foxtrot Unit. The Foxtrot Unit has four ranges. Inmates' cells in the Foxtrot Unit each have a small window that looks out into he hallway. The windows have a sliding trap that can be closed from the outside the cell if staff do not want the inmate to be able to see into the hallway. When the windows are open, inmates can only see clearly into the cell directly across from them and, at most, can only partly see into the cells to the left and right of the cell directly across from them. Inmates cannot see into the cells directly adjacent to their cell.

That day, all plaintiffs were housed on the 400 range of the Foxtrot Unit. Prude was in cell 423, Del Real was in cell 404, Johnson was in cell 421, Mitchell was in cell 416, Garcia was in cell 418, and Walker was in cell 422. That day, Gallinger and Ward were assigned to one of the strike teams conducting searches on the 400 range of Foxtrot Unit. While defendants

concede it was likely that Ward was assigned to a strike team on that date, she does not recall the details of the search conducted that day.

At about 8:20 a.m. on December 14, approximately fifteen staff members entered plaintiffs' housing range for the purpose of conducting the searches. Gallinger avers that when they entered the unit, the strike team closed all of the windows in the inmates' cells before starting the strip searches.

Plaintiffs dispute this. They all claim that cell windows remained open. They claim that when Gallinger entered the 400 range, he announced "I'm dying to see penises, especially big hairy ones," and began laughing. Plaintiffs claim that Gallinger then told Taylor and Ward that he wanted to conduct the strip searches for the "green phase" inmates (which included plaintiffs), and the three laughed and agreed.

Plaintiffs claim that Gallinger proceeded to conduct strip searches on all of the plaintiffs individually. Plaintiffs claim that each of them objected because of Gallinger's comment about seeing penises, and because the strip searches, conducted in the doorway of their cells, could be seen by female officers, other inmates, and maintenance workers. In response to their objections, Gallinger allegedly retorted: "This is how the strip search is being done so strip naked." Plaintiffs claim that they complied out of fear.

Plaintiffs claim that during the strip searches, Gallinger required plaintiffs to do jumping jacks (without any justification beyond wanting to humiliate them), and that Gallinger stared at their penises while they did so. Plaintiffs also claim that they were required to bend over and show their anuses in front of staff (including female staff) and other inmates. Plaintiffs claim that while they were forced to jump and bend over, other inmates and officers started laughing

at them, and homosexual inmates began making sexually explicit remarks and pointing at them. Plaintiffs allege that, due to maintenance going on at the institution at that time, they were forced to smell feces and sewage during the strip search. Plaintiffs claim that both Taylor and Ward stood by while Gallinger carried out the searches, and failed to intervene to stop the humiliation.

Defendants dispute plaintiffs' entire description of how Gallinger handled the searches. Most importantly, Gallinger denies commenting about seeing plaintiffs' penises, telling the plaintiffs to "strip naked," and requiring them to do jumping jacks naked. Gallinger does not remember whether he performed the strip search of all of the plaintiffs, but he acknowledges conducting strip searches in the past and he was a member of a strike team assigned to the 400 range of the Foxtrot Unit on December 14, 2017. However, he denies telling Ward and Taylor that he wanted to do all the strip searches for the green phase inmates.

Gallinger avers that any strip searches he's conducted were in private and consisted of the following steps: first, while standing outside an inmate's cell, he would ask each inmate individually if he would voluntarily comply with a strip search. If the inmate agreed, then Gallinger would open the cell door. If the inmate objected, then his door would remain closed and a supervisor would have been called to the cell. According to Gallinger, the searches were conducted within each cell while the windows of other inmates' cells were closed to prevent them from viewing the inmates being searched. Defendants also claim that female officers would not have been involved in strip searches.

Gallinger explains that to carry out the strip searches, he stood in the doorway of the cell and verbalized the steps of the strip search while visually observing the inmate. Specifically, he

directed the inmate to remove all of his closing and hand it to him. Then Gallinger handed the clothing to the second staff member who would have been to the left of him behind the door and out of the view of the inmate. Gallinger then directed the inmate to run his fingers through his hair, open his mouth, lift his tongue, lift his arms, and lift his scrotum. Finally, Gallinger would direct the inmate to turn around and lift his feet to check between his toes and bend at the waist and spread his buttocks. Gallinger explains that the purpose of checking these places is to ensure that the inmate is not hiding contraband on his body, since inmates have tried to hide items that would be used as weapons. Once the inmate had complied with each of Gallinger's directives, Gallinger would hand back his clothing, then Gallinger or another staff member would escort the inmate to the recreation area at the end of the hall. After the inmate left his cell, other members of the strike team conducted the cell searches.

For their part, Ward and Taylor deny laughing or joking about the strip searches to other inmates or guards. They further deny that the searches were conducted as described by plaintiffs, and neither remember Gallinger (or any staff member) ordering any inmates to do jumping jacks while naked. Taylor, who is female, avers that she would not have been involved in visually observing any inmate during a strip search, since she was only allowed to conduct a strip search in exigent circumstances. (Ward Decl. (dkt. 82) ¶ 6.) Taylor also does not recall any inmates complaining that the strip searches were not being conducted privately. Ward avers that he was not involved in visually observing any inmates during the strip searches. Finally, Ward and Taylor also deny seeing any inmates or staff laughing or joking about the searches.

Plaintiffs further claim that later on December 14, Ward approached Prude and told him that the strip searches should have been conducted in private, and that it "just wasn't right" that they were humiliated. Ward denies that he said this to Prude.

Finally, Prude claims that on January 24, 2018, Gallinger conducted a pat down on him. Prude claims that before the pat down, Gallinger told him to hold his hands out like an airplane and do jumping jacks, laughing and saying "it can never get old."[2] Gallinger denies that this interaction took place.[3]

[2] Defendants object to this proposed finding of fact as outside the scope of the claims in this lawsuit. While plaintiffs are not proceeding on any claims related to the January 24, 2018, pat down, Gallinger's comment, if true, could be relevant to whether he intended to humiliate plaintiffs during the December 14, 2017, strip search. As such, this comment may be relevant to plaintiffs' claim. That said, plaintiffs also assert that Gallinger has a reputation for forcing prisoners to do jumping jacks in the nude and clothed, citing to Federal Rule of Evidence 405(a). This is a legal conclusion related to the admissibility of evidence about Gallinger's reputation, so I have omitted this proposed fact. If plaintiffs have evidence about this supposed reputation, then they should file a motion in limine seeking its admission at trial. Plaintiffs should be aware that they face an uphill battle. Prude's testimony about Gallinger's reputation, based on just his own experience, is not enough to satisfy Rule 405(a).

[3] Plaintiffs include several proposed findings of fact related to Prude's efforts to obtain video footage of the January 24, 2018, incident. (Pl. PFOF (dkt. 43) ¶¶ 34-45.) Plaintiffs have not filed a spoilation motion related to this video footage, and the proposed findings of fact do not suggest that any video footage of this incident was recycled in bad faith to destroy adverse evidence. Accordingly, I have omitted these proposed findings of fact as immaterial.

Plaintiffs claim that as a result of how Gallinger conducted the search, they have subsequently been sexually harassed by the inmates who watched the strip searches.[4] That harassment, as well as the event itself, caused psychological harm.

## OPINION

Plaintiffs seek judgment in their favor on their claims against each of the defendants. Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). The burden of each party to a summary judgment motion depends on whether that party will bear the burden of proof at trial. Here, it will be plaintiffs' burden to prove the elements of their claims against defendants, so to succeed at summary judgment, they must establish that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56[c.

---

[4] Plaintiff Prude subsequently communicated with various WSPF staff (librarian Broadbent, Security Director Kartman, and Warden Boughton) in an effort to track down incident reports and video footage of this incident, but these efforts are not material to plaintiffs' motion. Prude claims that his communication with Broadbent constitutes evidence that Broadbent was present for the strip searches, but this is incorrect. On December 19, 2017, Prude submitted an Interview/Information Request to Broadbent, writing that she was keeping a record of the searches being conducted in his unit on December 14 and asking for the record of those searches. (*See* Pl. Ex. 2 (dkt. 44-1) 3.) Broadbent responded that she did not know where the records were. This document does not suggest that Broadbent actually witnessed the strip searches. The only reasonable inference to be drawn from this document is that Broadbent kept records of searches generally.

## I. Gallinger

A strip search in prison can violate the Eighth Amendment's prohibition against cruel and unusual punishment if the strip search was "motivated by a desire to harass or humiliate rather than by a legitimate justification." *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015). The inmate must prove that defendants conducted the search for the purpose of humiliating the inmate. *See id.* at 899 (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The challenged search must be "calculated harassment" or "maliciously motivated" conduct unrelated to institutional security. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004); *accord Sparks v. Stutler*, 71 F.3d 259, 262 (7th Cir. 1995) ("The eighth amendment's mental-state requirement . . . supplies protection for honest errors."). Even if there might have been *some* legitimate justification, a strip search can still violate the Eighth Amendment if "conducted in a harassing manner intended to humiliate and cause psychological pain." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009); *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003).

Here, plaintiffs do not challenge the decision to strip search the plaintiffs, they challenge how Gallinger allegedly searched them. The parties virtually every material fact related to how the searches were conducted. The parties dispute whether Gallinger made the statement that he was "dying to see penises, especially big hairy ones." They dispute whether Gallinger ordered prisoners to do jumping jacks while naked. They dispute whether any of the defendants laughed or joked about the strip searches to other inmates or to other employees. They dispute whether any female staff members observed or conducted any strip searches.[5]

---

[5] As defendants point out, even if the court were to assume, *arguendo,* that Gallinger conducted the strip searches in a way that permitted female staff members to view them, this would not entitled

Each of these disputed facts is material to whether Gallinger carried out the strip search with the intent to humiliate plaintiffs. Accordingly, plaintiffs have not established that they are entitled to judgment in their favor as to Gallinger. It will be for a jury to make that determination.

## II. Taylor and Ward

An official may be liable for a constitutional violation if he knew about it, had the ability to intervene, and failed to do so. *Koutnik v. Brown*, 351 F. Supp. 2d 871, 876 (W.D. Wis. 2004) (citing *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004)). To prove this claim, plaintiffs must show that (1) they were "incarcerated under conditions posing a substantial risk of serious harm"; (2) that Taylor and Ward has "subjective knowledge of the risk of harm"; and (3) Taylor and Ward "personally disregarded" that risk. *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (citation omitted). As for the first element, "[a] substantial risk of serious harm is one in which the risk is 'so great' that it is 'almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2015). A generalized risk is not enough. *Id.*; *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). To prove the second and third elements, plaintiffs must not only show defendants' awareness of the substantial risk of harm, but that they responded with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference is "the equivalent of criminal recklessness," *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007); ordinary negligence, and even gross

---

plaintiffs to summary judgment. *See Johnson v. Phelan*, 69 F.3d 144, 150-51 (7th Cir 1995) (strip search conducted before member of the opposite sex does not, by itself, violate the Constitution).

negligence, are simply not enough to establish a constitutional violation, *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Here, the parties dispute whether Taylor or Ward actually knew how Gallinger was handling the strip search. Both of them deny: (1) hearing Gallinger say that he was "dying to see penises, especially big hairy ones" and laugh; (2) observing Gallinger order any inmates do jumping jacks while naked; and (3) joking or laughing about, or observe any inmates or staff joke or laugh about, the strip searches. Finally, Ward claims he never told Prude that he felt the strip searches were not conducted properly. Since all of these facts are material to whether Taylor or Ward were deliberately indifferent to the risk that plaintiffs would be substantially harmed by the strip searches, plaintiffs are not entitled to summary judgment as to their failure to protect claims. Accordingly, this case will proceed to trial on May 4, 2020.

ORDER

It is ORDERED that plaintiffs' motion for summary judgment (dkt. 41) is DENIED.

Entered this 6th day of February, 2020.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge